## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 31 2019, 7:17 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT J.S.

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEY FOR APPELLANT T.J.

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of T.J. (Minor Child)

and

J.S. (Mother) and T.J. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 31, 2019

Court of Appeals Case No.
19A-JT-1003

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No.
79D03-1810-JT-139

**Crone, Judge.**

# Case Summary

J.S. ("Mother") and T.J. ("Father") (collectively "Parents") appeal a trial court order terminating their parental relationships with T.J. ("Child"). Finding that neither has established clear error, we affirm.

# Facts and Procedural History

The facts most favorable to the judgment are as follows. Mother and Father are the parents of Child, born in May 2016. In October 2016, Father was convicted of class A misdemeanor operating while intoxicated ("OWI") with endangerment, with Mother and Child as passengers in his vehicle. In January 2017, the Indiana Department of Child Services ("DCS") received two reports concerning the family. According to the first report, Mother was homeless and unable to provide a stable environment for Child, and according to the second report, police had been dispatched to a domestic disturbance involving Parents that resulted in Father's arrest. Parents had been the subject of several police contacts, including a report of domestic battery, an incident in which Father drove his vehicle with Mother hanging onto the outside of the window, and Father threatening Mother with a samurai sword. Police found Mother to have injuries consistent with domestic abuse. Father was incarcerated for a short time, and Mother refused to obtain a civil protective order and expressed her desire to reunite with him upon his release.

[3]     In February 2017, Child was removed from Mother's care and placed in protective custody in kinship foster care with the sister of Mother's best friend. Shortly thereafter, DCS initiated proceedings seeking to have Child adjudicated a child in need of services ("CHINS"). In April 2017, Child was adjudicated a CHINS. At that time, Mother was living with friends in a two-bedroom apartment, Father was incarcerated, and the two continued their romantic relationship. In its May 2017 dispositional order, the trial court ordered Mother to participate in a domestic violence assessment and services, a mental health evaluation, a psychological evaluation, a substance abuse assessment and services, a parenting and bonding assessment, home-based case management, individual therapy, and supervised parenting time. The trial court ordered Father to participate in a domestic violence assessment, a domestic abuse program called Character Restoration, substance abuse and parenting assessments, a mental health evaluation, home-based case management, a fatherhood engagement program, individual therapy, and supervised parenting time. Both Father and Mother were ordered to submit to random drug screens.

[4]     During the early stages of the CHINS proceedings, Mother became pregnant with twins. She was homeless during most of the pregnancy and was hospitalized several times for dehydration. Father executed paternity affidavits after the twins' births, but subsequent DNA tests showed him not to be their father. The twins were removed from Mother at the hospital and are not subjects of these proceedings.

[5]     Mother had various jobs throughout the pendency of the proceedings and was, more often than not, unemployed. Her housing arrangements included staying with various friends or extended family, and she was unable to establish independent, stable housing. She completed an initial assessment and was diagnosed with major depressive disorder. She also completed a parenting/family functioning assessment but vacillated between admitting and denying that Father physically abused her. Her participation in individual therapy and case management was limited. After two supervised visitation sessions, DCS changed Mother's visits to therapeutic supervised visits. In October 2017 and November 2018, the trial court found her in contempt for failure to submit to drug screens and participate in various services, including visitation, as she had not visited Child for about five months. By December 2018, Mother refused all services other than visitation. Mother visited Child six to eight times between November 2018 and January 2019.

[6]     During the pendency of the proceedings, Father was in and out of jail six times for short periods. In early 2018, he pled guilty to and was convicted of class A misdemeanor invasion of privacy for violating a no-contact order with respect to Mother. He had approximately five different jobs, including self-employment as a handyman. He had three different residences, including one in Illinois, where he stayed for three months during the pendency of the proceedings. He completed an initial assessment and a substance use assessment but failed to complete a parenting assessment or domestic violence services. He ceased all contact with Child as of February 2018. In July 2018,

he informed DCS Family Case Manager ("FCM") Lore Thompson that he never wanted DCS to contact him again. In November 2018, the trial court found him in contempt for failure to engage in the following ordered services: the character restoration domestic abuse program, fatherhood engagement program, home-based case management, individual therapy, and parenting time.

[7] In January 2018, DCS changed the permanency plan to adoption by the kinship foster family and initiated involuntary termination proceedings. The trial court found that DCS had failed to present clear and convincing evidence in support of termination and denied the initial termination petition. In October 2018, DCS filed a second petition for involuntary termination based on Mother's and Father's failure to engage in visitation or other services during the preceding months. The trial court conducted its factfinding in January 2019. In April 2019, the court issued an order with findings of fact, concluding that there is a reasonable probability that neither Mother nor Father will remedy the conditions that led to Child's removal, that there is a reasonable probability that continuation of Parents' parental relationships with Child would pose a threat to Child's well-being, that termination is in Child's best interests, and that there is a satisfactory plan for Child to be adopted by his current foster parents. Mother and Father now appeal the termination order. Additional facts will be provided as necessary.

# Discussion and Decision

[8] Parents separately challenge the sufficiency of the evidence supporting the trial court's judgment terminating their parental relationships with Child. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted). Where the appellant does not specifically challenge any of the trial court's findings, they stand as proven, and we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*; *see also McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (unchallenged findings are accepted as true).

[9] In *Bester*, our supreme court stated,

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and

raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

839 N.E.2d at 147 (citations, quotation marks, and alteration omitted).

[10] To obtain a termination of a parent-child relationship, DCS is required to establish in pertinent part:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

….

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[11] In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied*. "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted). "[I]f the court finds that the allegations in a [termination] petition … are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

## Section 1 – Father has failed to demonstrate that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that led to Child's removal will not be remedied.

[12] Father asserts that the evidence is insufficient to support the trial court's conclusion that a reasonable probability exists that the conditions that led to Child's removal will not be remedied.[1] He does not specifically challenge any of the trial court's findings, and as such, we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B.*, 971 N.E.2d at 110. When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Moreover, "the trial court should judge a parent's fitness to care for his [or her] children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. In

---

[1] Father also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. Indiana Code Section 31-35-2-4(b)(2)(B) requires DCS to prove only one of the three circumstances listed. Because we find no error concerning the reasonable probability that the conditions will not be remedied, we need not address the threat to Child's well-being.

making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[13] As a preliminary matter, we categorically reject Father's argument that the trial court based its termination order solely on unsubstantiated acts of domestic violence. As addressed more fully below, the unchallenged findings address multiple police reports and arrests pertaining to Father's abuse of Mother and other criminal activity, as well as his failure to comply with court-ordered services, including visitation. To the extent that he points to Mother's intermittent denials concerning the abuse, we note the trial court's unchallenged finding that Mother's vacillation was merely reflective of the on-and-off status of their romantic relationship. *See* Appealed Order at 3 (finding 18: "Depending on the status of the relationship, Mother would admit or deny domestic violence."). In short, the domestic abuse allegations were neither unsubstantiated nor the sole basis for the trial court's termination order. Father's argument therefore is meritless.

[14] Father asserts that the conditions that led to Child's initial removal pertain solely to Mother, i.e., her homelessness and instability. We disagree. Mother's homelessness and instability were the subject of the initial report to DCS, but

shortly thereafter, DCS received another report concerning domestic violence resulting in Father's arrest. As Father does not challenge any of the trial court's findings, they stand as proven and include, in summary: several reports of Father's domestic abuse with police intervention and physical evidence of injuries to Mother; Father's conviction for class A misdemeanor OWI with endangerment, where Mother and Child were passengers; his conviction for invasion of privacy for violating a no-contact order; his inconsistent employment (five different jobs and some handyman work); his inconsistent housing arrangements (three different residences, one in Illinois); his six different short-term stints of incarceration during the CHINS case; his discharge for failure to complete domestic violence services; his contempt citation for failure to participate in services such as home-based case management, individual therapy, fatherhood engagement and domestic violence programs, and parenting time; and his last communication with DCS, in July 2018, in which he stated "that he did not want any contact from DCS ever again." Appealed Order at 5.

[15] Father was incarcerated for several short stints during the pendency of the proceedings, and he did not consistently participate in his visitation sessions when he was not incarcerated. In the fall of 2017, he attended only three of seven scheduled visits despite DCS's accommodations to his schedule. He ceased all contact with Child as of February 2018. His failure to exercise his visitation rights demonstrates a lack of commitment to the parent-child relationship and the plan to preserve it. *See Lang v. Starke Cty. Office of Family &*

*Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (failure to exercise right to visit one's children demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship), *trans. denied*. In short, Father has failed to demonstrate clear error in the trial court's conclusion that the conditions that led to Child's removal will likely remain unremedied.

## Section 2 –Father has failed to demonstrate that the trial court clearly erred in concluding that termination is in Child's best interests.

[16]     Father also asserts that the trial court clearly erred in concluding that termination is in Child's best interests. To determine what is in the best interests of a child, we must look at the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016). Although not dispositive, permanency and stability are key considerations in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012) (quoting, *Lang,* 861 N.E.2d at 373). Likewise, "the testimony of service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[17]   With respect to Child's best interests, the trial court entered the following unchallenged findings:[2]

> 12.  …. At the time of the termination hearing, the circumstances of Parents had not improved.
>
> ….
>
> 41.  CASA, Bonnie Bodkin, supports termination of parental rights and adoption in the best interests of Child.  CASA noted Child has been out of the care of Parents since he was very small.  Child has been placed in the same kinship foster home for nearly two (2) years and needs a permanent home.  Child is bonded with the kinship foster parents who are prepared to adopt.  Child has some special needs and is undergoing testing for developmental delays and/or autism.  Nevertheless, Child is progressing in the caring and nurturing environment provided by the kinship foster family.

Appealed Order at 3, 6.

[18]   The totality of the circumstances shows that Father has a pattern of unhealthy interaction with Mother that manifests itself in physical violence and threats of violence, followed by a breakup and a reconciliation.  *See* Appealed Order at 3 (unchallenged finding 18: "The pattern of abuse in the relationship between Parents will likely continue.  Parents repetitively separated and reunited during the CHINS case.").  Father also has demonstrated a pattern of noncompliance

---

[2]  To the extent that the findings include the parties' proper names and initials, we refer to the parties as previously designated.

with court-ordered services followed by a discharge from those services. *See* Tr. Vol. 2 at 54 (FCM Thompson's testimony that most of Father's referrals were "short-term due to not showing up, oversleeping, being argumentative."). FCM Thompson described Father's communication as poor, testifying that he was very difficult to contact, despite his having three cell phones and five phone numbers. The last communication she received from Father was a July 2018 text saying that he "did not want [her] to contact … him ever again and that a new attorney would be in touch with DCS." *Id*. at 55. She concluded that Father "has refused to demonstrate th[e] ability" to take care of Child but that he "was fairly insistent through the case that we just give the child back to him.… [S]o … he did not accept responsibility for any … of his actions that may have led to the child being removed.… [H]e blamed DCS, he blamed [Mother]." *Id*. at 41, 54.

[19] Both CASA Bodkin and FCM Thompson testified that termination is in Child's best interests. As of the date of termination, Child had been in the same preadoptive foster placement for more than two-thirds of his life. He has a stable environment and is bonded with his preadoptive foster family, which includes his twin half-siblings. He has special developmental needs, the extent of which has yet to be fully diagnosed, but to which the foster family is currently attending. The totality of the circumstances supports the trial court's conclusion that termination of Father's parental rights is in Child's best interests, and Father has failed to meet his burden of demonstrating otherwise.

Consequently, we affirm the court's order terminating Father's parental relationship with Child.

## Section 3 – Mother has failed to demonstrate that the trial court clearly erred in concluding that termination is in Child's best interests.

[20] Mother limits her challenge to the trial court's conclusion that termination of her parental relationship with Child is in Child's best interests. She does not specifically challenge any of the enumerated findings but rather takes issue with isolated statements within the findings pertaining to the quality of her supervised visits with Child. We agree with DCS that this could loosely be characterized as a challenge to portions of findings 26 through 28, which read,

> 26. At the onset of the CHINS case, Mother was scheduled to attend supervised parenting time twice per week. Mother's level of engagement with Child was very low with a flat demeanor. Mother refused to accept redirection and did not benefit from modeling. The bond between Mother and Child was lacking.

> 27. Between June 2017 and January 2018, Mother was scheduled to attend therapeutically supervised parenting time. Mother failed to consistently attend visits as scheduled. Mother was in jail for a period of time. Mother was generally disengaged with Child and made little progress in this area. Mother did not initiate age appropriate activities for Child. Mother was hesitant to accept redirection and failed to incorporate parenting suggestions. The last scheduled visit was ended early due to Mother's extreme disrespect at which time Mother was unsuccessfully discharged.

> 28. Mother's visits resumed mid to late November 2018. Mother

has attended once per week as scheduled. Mother's level of engagement with Child has been adequate. However, Mother's repeated absences severely affected any bond with Child. Mother was absent approximately half of the CHINS case from December 2017 to April 2018. Mother was entirely absent from mid-April 2018 to September 2018. Mother was incarcerated for approximately thirty (30) day[s] shortly after the twins were born.

Appealed Order at 4.

[21] With respect to these findings, Mother does not dispute her absenteeism or disrespect but essentially disputes the court's statements that her level of engagement was very low during supervised visits, that her demeanor was flat, and that she lacked a bond with Child. Mother's Br. at 16. However, evidence in the record supports these findings. Family Services Specialist Jennifer Raderstorf testified that during her supervision of visitation sessions between Mother and Child,

> A. Um, [Mother] just was resistant. So, like, for example, if the kid would bring me a book, and I, you know, I would say, well he, he wants you to read, wants you to read to him, and she would say no, he just tears books, he can't have it. And so, I would model just reading the book with him and showing him pictures. And, I would ask her, would you like to try. No, she didn't want to.

> Q. Okay. How would you rate that level of engagement, um, of those two visits in mid-August 2017?

> A. Very poor.

Q. And, how would you describe the bond that you observed between mom and her, uh, son?

A. Um, I don't think that they had a bond.

Tr. Vol. 2 at 12.

[22] Mother claims that during visitation, she demonstrated that she could take care of such basic tasks as diapering and feeding Child and that her lack of engagement was due to fatigue associated with being pregnant with twins. Mother's assertions are more akin to explanations for her low energy level during visits rather than to claims of clear error in the findings. To the extent that she also points to the relative brevity of her time under Raderstorf's supervision, we again do not find this a challenge to the accuracy of the findings but rather an attempt to discredit Raderstorf's observations and recommendations. *See id*. at 13 (Raderstorf's recommendation that visits be changed to therapeutic after two sessions "[d]ue to the lack of engagement"). In short, Mother's assertions are merely invitations to reweigh evidence and reassess witness credibility, which we may not do.

[23] The totality of the circumstances shows Mother to be unable to develop consistent healthy patterns of daily living. Her employment history was haphazard, with shorts stints at fast-food restaurants or retail establishments, but more often than not, she was unemployed. Her housing was similarly unstable, as she generally went from "jumping from friend's couch to friend's couch," to staying with various relatives, to being homeless. *Id*. at 65. During

her pregnancy with the twins, she was essentially homeless and was hospitalized several times for dehydration. She repeatedly returned to her abusive relationship with Father and refused to take steps to ensure her own safety, e.g., her refusal to obtain a civil protective order or set up a safety plan when Father was released from incarceration. She was issued contempt citations for failure to comply with court-ordered services, including drug screens, individual therapy, domestic violence education, home-based case management, psychological evaluations, and visits with Child. In the spring/summer of 2018, she went about five months without contacting Child. *Id*. at 42. She re-engaged somewhat with her supervised visits in the final two months of the termination proceedings, attending six to eight visits. *Id*. at 71. However, CASA Bodkin observed Mother's lack of nurturing to be much the same in the supervised visitation session one week before the termination hearing as it had been a year earlier. *See id*. at 81 (CASA's testimony regarding last visit before termination hearing that Mother "pretty much sat on the chair and I didn't see any activity, didn't sit on the floor to play with [Child]."). In other words, Mother's last-minute visits show her failure to progress in terms of interacting meaningfully with Child. Yet she claimed to have no need for other services and refused any such participation. *See* Appealed Order at 4 (unchallenged finding 25.)

[24] FCM Thompson and CASA Bodkin both concluded that termination is in Child's best interests. FCM Thompson noted that Mother's circumstances had not improved during the pendency of the CHINS and termination proceedings.

Tr. Vol. 2 at 43. She explained that it had become "somewhat difficult to find providers willing to work with the family," *id*. at 41, and concluded, "Every child deserves permanency. [Child]'s been in this limbo for almost two years.… [F]ather hasn't seen him since February of 2018.… [M]other has a long history of instability as far as housing, employment. Um, she's not demonstrated the ability to take care of [Child]." *Id*. at 54. Meanwhile, as previously discussed, Child is in a stable home and has bonded with his preadoptive foster family. He has special needs that require a caregiver "who has the stability to maintain his appointments and follow through with those appointments." *Id*. at 55. CASA Bodkin also emphasized Child's need for stability and permanency, especially with his special needs and autism testing, and indicated that his preadoptive foster family has "a real … established commitment to him." *Id*. at 82. The testimony of service providers underscores his need for permanency and stability. *See A.K.*, 924 N.E.2d at 224 ("the testimony of service providers may support a finding that termination is in the child's best interests."). Mother has failed to demonstrate clear error in the trial court's conclusion that termination of her parental relationship with Child is in Child's best interests. Accordingly, we affirm.

[25]   Affirmed.


Baker, J., and Kirsch, J., concur.